```
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY
---------------------------------------------------------------------
JULIE A. SU, Acting Secretary of Labor, United States    :
Department of Labor,[1]
                                                         :
                        Plaintiff,
              v.                                         :
                                                               No. 2:20-CV-17785 (KM) (ESK)
ERNIE'S AUTO DETAILING INC. and ERNESTO                  :
DECENA a/k/a BUENAVENTURA E. DECENA,
individually,                                            :

                        Defendants.                      :
---------------------------------------------------------------------
```

# DECLARATION OF ARISTOTELES RODRIGUEZ

I, ARISTOTELES RODRIGUEZ, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I submit this declaration in support of the Secretary's application for default judgment against Defendants Ernie's Auto Detailing Inc. ("Ernie's Auto") and Ernesto Decena, a/k/a Buenaventura E. Decena ("Decena") (collectively, "Defendants"). This Declaration is based upon my personal knowledge of the facts and circumstances relevant to this matter, and if called, I would testify to the facts provided herein.

2. I am employed by the United States Department of Labor, Wage and Hour Division ("WHD") as an Assistant District Director ("ADD") for the Northern New Jersey District Office. My duty station is located at 200 Sheffield Street, Suite 102, Mountainside, NJ 07092. I have been employed by WHD as an ADD since October 23, 2022. Prior to my promotion to ADD and at the

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Secretary of Labor Julie A. Su is automatically substituted as Plaintiff.

time of the investigation related to this matter, I was employed by WHD as a Wage and Hour Investigator. I was employed by WHD as an investigator from May 23, 2010 to October 22, 2022.

3. When I was an investigator, my primary job was to conduct investigations of employers under the various federal labor statutes administered and enforced by WHD. The purpose of WHD's investigations is to determine whether employers are in compliance with such federal statutes and their supporting regulations.

4. The Fair Labor Standards Act of 1938 (the "FLSA" or the "Act") is one of the statutes enforced by WHD. The FLSA requires that employers pay overtime compensation equal to at least one and one-half times an employee's regular rate of pay for hours worked over 40 in a workweek. The Act and the applicable regulations also require the maintenance of accurate records of hours worked and compensation paid to employees.

### *Investigation of Defendants*

5. In January 2017, the WHD Northern New Jersey District Office initiated an investigation of Defendants to determine their compliance with the provisions of the FLSA. I was assigned as the lead investigator.

6. WHD's investigation covered the period from January 30, 2017 through January 26, 2020 (the "relevant time period").

7. During the investigation and this litigation, WHD obtained Defendants' time and pay records, including canceled checks from Defendants' bank accounts, and interviewed Defendants' employees.

8. As Defendants' own time and pay records plainly show, Defendants violated the FLSA's overtime and recordkeeping requirements.

9. Defendants used a time keeping system through a third-party web-based time keeping company called TimeStation LLC ("TimeStation"). Defendants used TimeStation at most of the worksites to keep track of their employees' hours worked during the relevant time period. Most of Defendants' employees accessed TimeStation by using a cell phone or tablet to clock in when they began working and clock out when they finished working. Based on the information I obtained during the investigation, with the rare exception of when employees likely forgot to clock out, the time records maintained in the TimeStation system accurately reflected the hours worked by Defendants' employees.

10. I reviewed both Defendants' formal payroll records as well as canceled checks from Defendants' bank statements which reflected payments to employees. The canceled checks from Defendants' JP Morgan Chase accounts generally corresponded with the amounts paid in the payroll records. However, the canceled checks from Defendants' TD Bank accounts reflected: (a) payments made to employees who were not on Defendants' payroll; and (b) additional payments made to employees in amounts not reflected on the payroll even though these employees were on Defendants' payroll for the same workweeks.

11. Furthermore, the hours worked reflected on the formal payroll records did not reflect all of the hours worked on Defendants' TimeStation records. Specifically, Defendants' payroll records vastly underrepresented the actual number of hours worked by employees during the relevant time period.

12. For example, Defendants' time records show that for every workweek from the week ending July 8, 2018 through February 3, 2019, employee Christian De Jesus Cespedes Germoso worked at least 52 hours and as many as 76.73 hours per week with an average of 65.97 hours per week. *See* Ex. 2 at 101-102 (hours worked transcribed from TimeStation records). In

contrast, for week ending July 18, 2018 through February 3, 2019, Defendants' payroll records falsely show that Christian De Jesus Cespedes Germoso worked only 40 hours each of these workweeks. *See* Ex. 9 (excerpt of payroll obtained during WHD investigation, DOL 3355-3356).

13. As another example, Defendants' time records show that for every workweek from the week ending November 11, 2018 through February 24, 2019, employee Miguel Alcantara Medina worked at least 46.03 hours and as many as 67.22 hours per week with an average of 59.03 hours per week. *See* Ex. 2 at 477-78 (hours worked transcribed from TimeStation records). In contrast, Defendants' payroll records show that Medina worked only 30 hours each week during the same time period. *See* Ex. 10 (excerpt of payroll obtained during WHD investigation, DOL 3301-3302).

14. When comparing Defendants' payments to employees with the amount of hours worked in the TimeStation records, it is clear that Defendants failed to pay their employees any overtime premiums when employees worked over forty hours in a workweek. Instead, the total payment amounts divided by the hours worked in TimeStation generally reflected that Defendants only paid employees their straight hourly rate for all hours worked.

15. For example, for the week ending July 8, 2018, the TimeStation records show that employee Isaac Morales Barranco worked 69.13 hours. *See* Ex. 11 (excerpt of TimeStation records for week ending July 8, 2018). This employee was not on Defendants' formal payroll records, but received a non-payroll check of $691, which noted on the memo line that the payment was for "Week of 7/2/18-7/8/18." Ex. 12 (copy of non-payroll check). Thus, Defendants only paid this employee $10 per hour ($691 divided by 69.13 hours) for all hours worked without any overtime premium. This hourly rate was consistent with the hourly rate for this employee as reflected in the TimeStation records.

16. As another example, for the week ending August 20, 2017, according to Defendants' payroll records, employee Tobias Guerrero received $380 in gross wages for 40 hours. *See* Ex. 13 (Excerpt of payroll obtained during WHD investigation, DOL1824). For that same week, he also received a separate check for $183. *See* Ex. 14 (copy of non-payroll check). In total, this employee received $563 in gross wages for this particular workweek. According to Time Station, he worked 59.32 hours for the same week. *See* Ex. 15 (excerpt of TimeStation records for week ending August 20, 2017). Thus, Defendants only paid this employee approximately $9.50 per hour ($563 divided by 59.32 hours). This hourly rate was consistent with the hourly rate for this employee as reflected in the TimeStation records.

17. Accordingly, we computed back wages owed based on the total weekly hours worked and hourly pay rates reflected in the TimeStation records, rather Defendants' inaccurate and incomplete payroll records.

### *Back Wage Computations*

18. For the period from January 30, 2017 (workweek ending February 5, 2017) through January 26, 2020, WHD computed a total of back wages of $8,277,810.00 due to 1,504 employees resulting from Defendants' FLSA violations.

19. Attached hereto as Exhibit 1 is the summary of the total back wages owed. Exhibit 1 also notes the applicable geographic regions that a particular employee worked. The computations are divided into seven geographic regions to reflect the various state minimum wage rates during the applicable period, which were all higher than the federal minimum wage of $7.25 per hour except for Pennsylvania. These geographic regions correspond with Exhibits 2-8 as follows:

   a. Exhibit 2 reflects the unpaid overtime back wages owed for work performed in New Jersey;

    b. Exhibit 3 reflects the unpaid overtime back wages owed for work performed in New York City;

    c. Exhibit 4 reflects the unpaid overtime back wages owed for work performed in Westchester, New York;

    d. Exhibit 5 reflects the unpaid overtime back wages owed for work performed in Long Island, New York;

    e. Exhibit 6 reflects the unpaid overtime back wages owed for work performed in other regions in New York State;

    f. Exhibit 7 reflects the unpaid overtime back wages owed for work performed in Connecticut; and

    g. Exhibit 8 reflects the unpaid overtime back wages owed for work performed in Pennsylvania.

20. To determine the amount of unpaid overtime wages owed, we first determined the employees' regular rate of pay.

21. If the hourly pay rate reflected in the TimeStation records was the same as or above the applicable state minimum wage, we used the hourly pay rate from TimeStation as the regular rate of pay. *See* 29 C.F.R. § 778.5 ("Where a higher minimum wage than that set in the [FLSA] is applicable to an employee by virtue of such other legislation, the regular rate of the employee, as the term is used in the [FLSA], cannot be lower than such applicable minimum, for the words 'regular rate at which he is employed' as used in section 7 must be construed to mean the regular rate at which he is lawfully employed."); 29 C.F.R. § 778.108 ("If the employees' regular rate of pay is higher than the statutory minimum, [the] overtime compensation must be computed at a rate not less than one and one-half times such higher rate."). We then multiplied one-half of the regular rate of pay by the hours exceeding 40 to determine the additional half-time overtime compensation owed.

22. However, if the hourly pay rate reflected in the TimeStation records fell below the applicable state minimum wage, we used the higher state minimum wage rate as the regular rate.

*See* 29 C.F.R. § 778.5. To determine how much overtime compensation was owed to employees whose hourly rate of pay in overtime workweeks fell below the applicable state minimum wage rate, we subtracted the hourly rate reflected in the TimeStation records from the applicable state minimum wage rate and multiplied that amount by the total amount of hours worked. *See* 29 C.F.R. § 778.315 ("[Overtime compensation] cannot be said to have been paid to an employee unless all the straight time compensation due him for the nonovertime hours . . . under any applicable statute has been paid."). We then multiplied one-half of the regular rate of pay by the hours exceeding 40 to determine the additional half-time owed.

23. Each of the detailed computations in Exhibits 2 through 8 include the following columns:

24. The first column, labeled "Week Ending Date," identifies the workweek that the employee worked over 40 hours by the ending date of that workweek. The week ending date is a Sunday, reflecting a workweek from the preceding Monday through Sunday.

25. The second column, labeled "Name," identifies the employee owed back wages.

26. The third column, labeled "Hourly Rate," reflects the hourly rate for that employee in the TimeStation records. If an hourly rate was not reflected in TimeStation for a particular employee for a particular workweek, which happened less than three percent of the time, we used the applicable state minimum wage rate as the hourly rate paid.

27. The fourth column, labeled "Hours/ Week" reflects the number of hours worked by that employee in that particular workweek based on the TimeStation records. In the rare instance that an employee's hours in TimeStation appeared to be in error because the employee may have forgotten to clock out, we adjusted the hours worked based on the hours that employee worked in other days or in other similar workweeks. For ten of the employees who worked at Lexus/Nissan

7

Bayridge worksite, there were no TimeStation records. However, we used some timecards and other information obtained during the investigation to determine that they worked an average of 60 hours per week. *See, e.g.*, Ex. 3 at 5-8, 32-37, 45-48, 62, 149-150, 186-188, 192-193.

28. The fifth column, labeled "State Minimum Wage," reflects the applicable minimum wage rate based on state law, as described in paragraph 22 above.

29. The sixth column, labeled "Section 7: Regular Rate Due," reflects wages owed under section 7 of the FLSA if Defendants failed to pay that employee the lawful regular rate. As described above in paragraph 22, to determine how much overtime compensation was owed to employees whose hourly rate of pay in overtime workweeks fell below the applicable state minimum wage rate, we subtracted the hourly rate (third column) from the state minimum wage rate (fifth column) and multiplied that amount by the total amount of hours worked (fourth column).

30. The seventh column, labeled "Section 7: Half-time Due," reflects the amount of overtime wages due for not paying overtime premiums for hours worked over forty. To determine the half-time due, we subtracted 40 hours from the hours worked that week (fourth column) and then multiplied the hours over 40 by half of the regular rate of pay, either the hourly rate (third column) or the applicable state minimum wage rate (fifth column), whichever was higher.

31. Finally, the eighth column on each analysis, labeled "Total Section 7 Overtime Back Wages Due," reflects the total overtime back wages owed to each employee in that particular week. It is the sum of the sixth and seventh columns.

32. As set forth in Exhibit 1, in total, Defendants owe $8,277,810.00 in unpaid back wages, plus an equal amount in liquidated damages, for a total of $16,555,620.00 to the 1,504 employees identified in Exhibit 1.

8

DATED:    May 11, 2023
               Mountainside, New Jersey

                                            Aristoteles Rodriguez
                                            Assistant District Director